[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a limited dissolution of marriage action commenced by the plaintiff in October 2000. The defendant filed a cross-complaint seeking similar relief.
 Jurisdictional and Related Findings
1. The plaintiff, whose maiden name was Davita A. Silva, and the defendant intermarried on June 9, 1973 at Green Acres, New York.
2. The plaintiff has resided continuously in the state of Connecticut for at least twelve months next preceding the date of this action.
3. The marriage between the parties has broken down irretrievably and there is no reasonable prospect they will reconcile.
4. There is one minor child issue of their marriage, namely Morgan Glasberg, born June 18, 1992. (A daughter was also born issue of the marriage in 1981, however, she is no longer a minor).
5. Neither party receives aid or support from the state of Connecticut.
Both parties were represented by counsel and the Court has jurisdiction in this matter.
 Applicable Law
Connecticut General Statutes § 46b-81 sets forth the considerations to be used in determining the equitable distribution of marital assets. Those considerations include the length of the marriage, the cause for the dissolution, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. "Contribution" includes nonmonetary as well as monetary contributions and includes homemaking and primary caretaking responsibilities. O'Neill v. O'Neill,13 Conn. App. 300, 311-12 (1988).
In entering its property orders, the Court shall take into consideration all of the criteria set forth in § 46b-81, but is not required to make express findings on each of the criteria,Weiman v.Weiman, 188 Conn. 232, 234 (1982), nor is it required to give equal weight to each of the specified criteria and no single criteria is preferred over the other. The Court has wide latitude in weighing each CT Page 10665 criteria under the individual circumstances of each case. Carpenter v.Carpenter, 188 Conn. 736, 740-41 (1982). Collucci v. Collucci,33 Conn. App. 536, 539 (1994). The Court's charge is to distribute, as equitably as possible, the marital assets of the parties.Rubin v. Rubin,204 Conn. 224, 228 (1987). Similar provisions apply to alimony awards, see § 46b-82, of the general statutes.
 Discussion
The parties began dating in 1968 and dated through their college years. In 1976 the plaintiff obtained her Master's degree and in 1978 began teaching, while at the same time studying for her PHD. In 1983 she obtained her PHD in sociology, and in 1985 obtained her first post PHD employment at the University of Southern Illinois. Their first child was born in 1981 and the plaintiff assumed primary care duties in addition to her teaching and academic pursuits.
During those early years of their marriage the defendant was employed as a margins clerk for Merill, Lynch, Pierce, Fenner and Smith (1973-1974) and as a claims examiner for the New York Department of Labor (1975-1983).
It was understood that once the plaintiff obtained her advanced degrees the defendant would then complete his education by completing the work for a master's degree. While in Illinois, he did complete the necessary course work but had not worked on his required thesis.
In 1988 the parties moved to Connecticut when the plaintiff was offered a job at the University of Connecticut where she is now a tenured professor.
After leaving his job with the New York Department of Labor, the defendant showed little interest in obtaining employment commensurate with his education. His interest in political activism and in organizing community betterment programs was growing but neither of these areas was monetarily rewarding even when the rare job opening presented itself.
The plaintiff shouldered most of the financial burden of providing for the material need of the family from the time they moved to Illinois.
Back in Connecticut the plaintiff prodded the defendant to complete his master's thesis, which, with her help, he satisfactorily completed in 1991.
Because money was tight, when they came to Connecticut in 1988, they lived in a small student housing apartment. After their second child CT Page 10666 Morgan was born in 1992, that apartment was totally inadequate and with $20000 given to the plaintiff by her father (as an advance on her inheritance) in 1994, she was able to make a down payment on a house which is solely in her name.
At about that time, while the defendant was busying himself with volunteer activities such as serving on the town of Mansfield Water Advisory Council and as a community garden coordinator for the town of Windham, the plaintiff was becoming more and more distressed over the fact that he was not contributing very much, if anything to the financial support of the family. She gave him an ultimatum to either get a job within six months or get out. As the deadline neared he obtained a job as an X-tra-Mart store clerk in December 1994. He was promoted to assistant manager in May 1995 and to manager in February 1996. In December 1996, he was demoted back to assistant manager (he claims it was because he could not discipline employees or get the necessary reports done). In 1998 he was again demoted to store clerk and in 1999 lost that job when the store closed. He collected unemployment compensation for a time and at the end of 2000 he obtained his present job as a counter clerk at a Dunkin' Donuts store.
One of the major points of contention in this case is the term and amount of alimony which should be awarded to the defendant. He seeks $250 weekly for the duration of his life while the plaintiff proposes periodic alimony of $150 weekly for two years, $125 weekly for the next two years, $100 weekly for the next two years and $75 weekly for the next two years, to be nonmodifiable as to the amount or term.
It is clear that the defendant has not been employed at a level commensurate with his education, and that he is unlikely to obtain such commensurate employment in the future. What is not so clear is whether he has a greater earning capacity than his current employment as Dunkin' Donuts counter man earning $7.50 per hour.
Since 1999 the defendant has been treating with Dr. John Haney, a psychiatrist who treated him for symptoms of depression and attention deficit disorder. Dr. Haney treated those symptoms primarily with medication (Risperdal and Zoloft), however the defendant recently of his own volition stopped taking the prescribed medications. Dr. Haney described the defendant as being "remarkably stable" with the medications and has not noticed any significant change in the defendant in the three instances he saw him since January, 2002, but did believe the defendant was a "little less quiescent".
Dr. Haney also testified he could probably handle a job as a night watchman or security guard assuming the physical condition of his left CT Page 10667 hand was not a problem. (In 1991 the defendant was diagnosed with cancer in his left arm which required surgery and chemotherapy). As a result of the cancer, his index finger has limited function and he needs to wear a pressure stocking on his arm to keep it from swelling. It is, however, noted that the defendant's dominant hand is his right hand, and he was not physically unable to perform his duties at the X-tra Mart store or at Dunkin' Donuts. The husband was referred by Dr. Haney for a personality profile test Minnesota Multiphasic Personality Inventory Test. (MMPI-2)-Exhibit 5. His profile indicated depression, paranoia and atypical thinking (but not a psychosis), at times he is "Don-Quixotic", and prone to poor judgments.
The defendant testified that he is slow in doing work duties, that he has difficulty in focusing, that his present job is in jeopardy because his supervisor does not like him, that he is fearful and anxious about his future and needs alimony permanently in order to survive. He does not think he could carry out the duties involved in other suggested jobs which would likely pay more money and offer fringe benefits such as medical insurance and retirement plans. According to him, a night watchman's job would be too much for him as he would be fearful of being alone and being in charge would be too stressful.
On the other hand, he has in the past had sustained periods of employment such as the New York Labor Department, and at the X-tra Mart, working for several years in each place.
More recently (1995-1996) he was an organizer and a leader of the "Stop the Stadium" organization whose goal was to prevent the state from building a football stadium for the New England Patriots football team. He was also involved in the "Save Horsebarn Hill" protest which was successful in thwarting plans to erect buildings at that location at the University of Connecticut. (He termed his involvement with these types of programs as his "obsession", as things he felt compelled to do as a political or community activist). In 2001, he ran for a seat on the town council for the town of Mansfield as a member of the Green Party.
These activities indicate that he can focus, inter-relate with people, think coherently and could work at least a semi-skilled job, if he needed to do so. He also testified that some things are more important than supporting a family.
The plaintiff testified that, while he would prefer to expend his effort at bettering the world, when necessary he can and does hold down a job, and actually does better when he is working.
Walter Smith, an abutting neighbor of the parties since 1997, testified CT Page 10668 the defendant was "engaging, intelligent, had a strong focus, was very social in group affairs and expressed himself well when he ran for public office in 2001."
Hank Lerner, an expert in clinical psychotherapy and vocational rehabilitation, reviewed the defendant's medical records and based on that review (he did not interview the defendant) testified that he could probably do semi-skilled work, such as a night watchman, and that vocational rehabilitation programs are available and might be of help in getting a better job.
While the defendant may not be able to function at a level commensurate with his educational background, he is clearly not totally disabled and, the Court believes, he has the ability to work at a job with higher earnings. He most certainly could do so with vocational rehabilitation and antidepressant medications, although even without such assistance, he should be able to earn $10 to $12 per hour plus fringe benefits such as insurance (see Exhibit B).
The plaintiff has been primarily carrying the financial burden of supporting the family since approximately 1984. She has paid for the college education of their older child, now going into her senior year. She will necessarily have to pay for their son's college, who is now ten years old. Morgan is a promising violinist who will be taking lessons next year at the Hart School of Music which the plaintiff will pay for. She pays most of the costs for the food, clothing, shelter and extracurricular activities of the family such as vacations, bat mitzvah and bar mitzvah and religious school.
It does not seem fair or equitable for the plaintiff, who has, herself worked hard to achieve her professional status, who has been the primary support of the family for some eighteen years and who will necessarily continue to primarily support and educate their minor son, to be required to pay lifetime alimony to the defendant, so that he can pursue his dreams of political and community activism while not working up to his earning capacity.
The foregoing discussion is intended to serve as an explanation of the findings which are the basis for the orders being entered.
Other findings will be discussed as needed to explain the orders being entered.
 ORDERS
Dissolution: The Court finds the marriage has broken down irretrievably. CT Page 10669 Judgment shall enter dissolving the marriage on said grounds.
Custody: The parties shall have joint legal custody of the minor child Morgan, with the wife having primary physical custody.
Parenting Access: The husband shall have visitation with the minor child one evening per week during the school year, alternating weekends, alternating holidays and two non-consecutive weeks during the summer school vacation.
Child Support: The husband shall pay child support in the amount of $48.00 per week until the minor child shall attain age eighteen and graduate high school or attain age nineteen, whichever comes first. It is noted that the husband's financial affidavit does not accurately reflect his average weekly earnings of the prior thirteen weeks. It is understated by approximately $20.00 per week (or more). However, it appears that $48.00 is in substantial compliance with child support guidelines. The husband shall also pay 13% of unreimbursed medical and dental expense for the minor child. The order for child support shall be enforced by a contingent wage execution order.
Alimony: The plaintiff earns $1663.33 weekly (gross). In addition she presently earns $54.00 in royalties from a book she co-authored, although that royalty payment will diminish and probably end in a year or so. Her net weekly income is $1388.00. The defendant earns $7.50 per hour or $300 gross weekly. His financial affidavit indicates a net of $200, however that is an incorrect figure as noted above. He probably nets closer to $220. In addition to the income shown on his financial affidavit, cross-examination revealed he has access to funds he described as coming either from his mother's estate as an inheritance or from an account she established prior to her death. He is vague about what sums are available to him claiming that his brother handles those funds and sends him money from time to time when requested. From the bank records introduced it appears he received $4000 in March and $5600 in February of this year. He states he thinks the account has about $25000 but this is given as an uncertain figure and is not verified.
As found earlier the defendant's earning capacity is $10 to $12 per hour, plus fringe benefits, especially medical insurance, and he should be encouraged to obtain such employment.
The concept of time limited alimony is the sound and desirable, policy to provide an incentive for the spouse receiving support to us diligence in attaining self-sufficiency. Ashton v. Ashton, 31 Conn. App. 736
(1993). Once ordered, alimony is modifiable only upon a showing of a substantial change in circumstances of either party. The statutory CT Page 10670 language of § 46b-86 "suggests a legislative preference favoring modifiability of orders for periodic alimony. Rau v. Rau, 37 Conn. App. 209
(1995).
Considering all the facts and circumstances of this case, including other financial orders, and applying the provisions of § 46b-82 of the general statutes, the Court orders that the plaintiff wife shall pay periodic alimony to the husband the sum of $150 per week for two years, $125 per week for the next two years, $100 per week for the next two years and $75 per week for the next two years, upon which alimony shall terminate. Said alimony shall be non-modifiable as to term, but not as to amount. It shall terminate sooner upon the death of either party or remarriage of the husband. This term coincides with the minor child reaching eighteen years of age, at about the time when the defendant's support obligation will end.
Medical Insurance: The wife shall maintain medical and dental insurance for the benefit of the minor child as available through her place of employment. In the event such insurance is not available through the wife's employment, the husband shall maintain such insurance as available through his place of employment.
The signature of the custodial parent of the insured dependent shall constitute a valid authorization to the insurer for purposes of processing an insurance reimbursement payment to the provider of the medical services or to the custodial parent. Neither parent shall prevent or interfere with the timely processing of any insurance reimbursement claim. If the parent receiving an insurance reimbursement payment is not the parent who is paying the bill for the services of the medical provider, the parent receiving such insurance reimbursement payment shall promptly pay to the parent paying such bill and insurance reimbursement for such services. The custodial parent is responsible for providing the insurer with a certified copy of the order requiring maintenance of insurance for a minor child. Such insurer may thereafter rely on such order and is not responsible for inquiring as to the legal sufficiency of the order. The custodial parent shall be responsible for providing the insurer with a certified copy of any order which materially alters the provision of the original order with respect to the maintenance of insurance for a minor child. If presented with an insurance reimbursement claim signed by the custodial parent, such insurer shall reimburse the provider of the medical services if payment is to be made to such provider under the policy, or shall otherwise reimburse the custodial parent.
The wife shall maintain COBRA medical and dental insurance for the benefit of the husband for not longer than one year, however, if the husband obtains employment which provides medical insurance for him, in CT Page 10671 that event the wife's obligation to provide such insurance shall sooner end.
Life Insurance: The husband shall make his best efforts to maintain his existing life insurance for the benefit of the minor child for as long as he has a support obligation.
Pension Plans: The husband shall receive, through a Qualified Domestic Relations Order, one-third of the wife's pension at TIAA-CREF as of the date of dissolution. This Court shall retain jurisdiction with reference to implementation of said QDRO. The husband shall retain the pension plan presently in his name.
Debts: The wife shall be responsible for all joint marital debt of the parties (approximately $13000). The husband shall be responsible for his student loan or loans and any debt incurred since separation of the parties.
Real Estate: The marital home known as 29 Lodi Drive, Storrs, Connecticut has, by stipulation, a fair market value of $150000. It is subject to a mortgage of approximately $130000. The down payment to purchase the home was provided by a gift of $20000 from the wife's father. Title is in the wife's name and she shall retain exclusive ownership of the property, and hold the husband harmless from all mortgage, taxes, insurance and other expenses associated with said property.
Personal Property: The husband shall retain his baseball card collection. (The Court credits the wife's testimony that the value is approximately $20000). Each party shall retain the vehicles they presently utilize, free and clear of any claims of the other thereto. Each party shall retain the personal property presently in their possession, free and clear of any claim of the other thereto.
Attorney's Fees: Each party shall be responsible for his or her own attorney's fees.
Taxes: Because of the disparate contributions to the support of the minor child, the wife shall be entitled to take said child as a tax deduction for both federal and state taxes.
Klaczak, J. CT Page 10672